## LYTLE *v.* LANSING.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF NEW YORK.

No. 79. Argued December 6, 7, 1892. — Decided January 3, 1893.

When negotiable bonds of a municipality, issued in aid of a railroad company, are void as between the railroad company and the municipality, the burden is upon the holder to show that he, or some one through whom he obtained title to them, was a *bona fide* purchaser for a valuable consideration.

The settled rule in equity that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but also at the time of the payment of the purchase money, applies to the purchase of negotiable municipal bonds.

It is the duty of one who purchases municipal bonds, knowing that the municipality is contesting its liability on them, to make inquiries, and the failure to do so will be held to be a wilful closing of his ears to information.

The several holdings of the bonds which form the subject of this litigation since they passed out of the railroad company examined, and *held* to be either as collateral for a debt which has been paid, or as fictitious, for a real owner who is affected with notice of their invalidity.

THIS was an appeal from a decree requiring the appellant to surrender for cancellation seventy-five bonds of one thousand dollars each, purporting to have been executed by the town of Lansing, and dismissing a cross-bill filed by Lytle to compel the payment of the overdue coupons attached to such bonds.

By an act of the legislature of New York, passed in 1869, Laws of 1869, 2203, c. 907, it was provided that whenever a majority of the taxpayers of any municipal corporation, owning or representing a majority of the taxable property, should make application to the county judge, stating their desire that

such corporation should issue its bonds to an amount not exceeding 20 per cent of the taxable property, and invest the same in the stock or bonds of such railroad company as might be named in the petition, it became the duty of such county judge to order a notice of such petition to be published, and to take proof as to the number of taxpayers joining in the petition, and the amount of taxable property represented by the petitioners. In pursuance of this act, in December, 1870, petitions of certain taxpayers of the town of Lansing were presented to the county judge of Tompkins County, who caused the proper notice to be published, proceeded to take proofs, and on March 20, 1871, adjudged and determined that the petition was duly signed by a majority of the taxpayers of the town of Lansing; that the petitioners represented a majority of the taxable property; that the sum of $75,000, mentioned in the petition, did not exceed 20 per cent of the whole taxable property of the town; and that all the requirements of law respecting the issuing of town bonds, to the amount of $75,000, and for the investment of the same in the stock or bonds, or both, of the "Cayuga Lake Railroad Company," had been fully complied with. He thereupon appointed three freeholders and taxpayers of said town as commissioners, whose duty it would be to execute such bonds and to discharge all such other duties as should be required of them as such commissioners. On March 27, 1871, a writ of *certiorari* was sued out of the Supreme Court to review these proceedings, and in May, 1872, the general term of such court ordered and adjudged that all the proceedings in relation to the issuing of these bonds should be reversed, annulled and held for naught, for the reasons that the Cayuga Lake Railroad Company was not a legal corporation; that the articles of association failed to state the name of each county through or into which the road was intended to be made; that no valid charter was produced before the county judge; that the petition did not direct whether the money was to be invested in stock or bonds; and that it was not shown that a majority of the taxpayers had signed the petition. *People* v. *Van Valkenburgh*, 63 Barb. 105.

In some way — though exactly how did not clearly appear — the railroad company induced the commissioners to issue and deliver to them these bonds, for which they received a certificate for an equivalent amount of railroad stock. The allegation of the bill in this connection was that the officers of the railroad company fraudulently and by false pretences procured the commissioners to deliver the bonds, by representing and inducing them to believe that their action would not in any way injure or affect the town, and also by presenting to them an undertaking of the company to indemnify and save them harmless from the consequences of their act. It was further alleged that the stock of the company received in exchange for these bonds was of no value; that the company had ceased to do business, and was insolvent; and that the town was ready to deliver up the stock in exchange for the cancellation of the bonds.

It appears that these bonds, when delivered to the railroad company, were pledged by it to Leonard, Sheldon & Foster, a banking firm in New York City, as collateral security for a loan of $50,000 to the railroad company; that this loan was afterwards transferred to Elliott, Collins & Co., bankers at Philadelphia, to whom the bonds were also turned over as collateral; that this latter company also had authority from the railroad company to sell them for the company at the price of from seventy to eighty cents on the dollar; and that in February, 1873, the firm sold them, deducted from the proceeds the amount of their loan, and left a balance of $4745.83 to the credit of the railroad company. It did not appear to whom Elliott, Collins & Co. sold the bonds; but subsequently an action was brought in the United States Circuit Court against the town upon these bonds by one John J. Stewart, in which action a verdict was rendered on December 19, 1878, for the defendant. The judgment in favor of the town was afterwards, and on June 30, 1882, affirmed by this court. *Stewart v. Lansing*, 104 U. S. 505. In February, 1882, the bonds appear to have been sold by Stewart to one Brackenridge, who afterwards, and in May, 1884, sold them to Lytle, the plaintiff in this suit, for an interest in a ranch.

This action was begun by the town of Lansing in the Supreme Court of the State of New York, in May, 1887, for the purpose of obtaining the annulment and cancellation of the bonds, compelling the defendant Lytle to deliver them up for cancellation, and also enjoining him from transferring them pending the suit. Lytle removed the action to the Circuit Court of the United States, and filed a cross-bill to compel the payment of the bonds. In March, 1889, the court rendered a decree in favor of the town of Lansing, 38 Fed. Rep. 204, from which Lytle took an appeal to this court.

*Mr. Thomas G. Shearman,* (with whom was *Mr. Everett P. Wheeler* on the brief,) for appellant.

*Mr. H. V. Howland* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

As the bonds in this case, though good upon their face, were undoubtedly void as between the railroad company and the town of Lansing, it is incumbent upon the defendant Lytle to show that he, or some one through whom he obtained title to them, was a *bona fide* purchaser for a valuable consideration. *Orleans* v. *Platt,* 99 U. S. 676.

The judgment of the Supreme Court of the State of New York, holding these bonds to be invalid, must be respected by this court, not only because it passed upon the validity of acts done in alleged pursuance of a statute, but because in a collateral proceeding of this kind its binding effect could only be avoided by showing a total lack of jurisdiction on the part of the court. When these bonds were before this court in the case of *Stewart* v. *Lansing,* 104 U. S. 505, it was held that the judgment of the Supreme Court reversing and annulling the order of the county judge invalidated them; that if they had not been delivered before, they could not be afterwards; and that the judgment of reversal was equivalent between those parties to a refusal by the county judge to make the original order. It was further held that, the actual illegality of the

paper being established, it was incumbent upon the plaintiff to show that he occupied the position of a *bona fide* holder before he could recover. In such a case, however, the plaintiff fulfils all the requirements of the law by showing that either he, or some person through whom he derives title, was a *bona fide* purchaser for value without notice. *Douglas County Commissioners* v. *Bolles,* 94 U. S. 104; *Montclair* v. *Ramsdell,* 107 U. S. 147; *Scotland County* v. *Hill,* 132 U. S. 107.

We proceed to examine the title of the several holders of these bonds from the time they were delivered to the railroad company, which of course was not a *bona fide* holder, to the time they came into possession of the plaintiff.

1. *Leonard, Sheldon & Foster.* These were New York bankers, to whom the bonds were pledged as security for a loan of $50,000 to the railroad company; they also received them with power and instruction from the company to sell them. It is sufficient to say in this connection that this firm never purchased the bonds; that they continued to be the property of the railroad company while in their hands; and that while, doubtless, they would have been protected as *bona fide* holders to the amount of their advances, they never took title to the bonds, and when they transferred them to Elliott, Collins & Co., and received from them the amount of their advances, they transferred them as the property of the railroad company, and their interest in them from that time wholly ceased.

2. *Elliott, Collins & Co.* took up the loan of the prior firm upon the written order of the treasurer of the company, and stood in the same position they had occupied. They subsequently sold the bonds for the railroad company for $54,337.50, paid their loan to the amount of $49,591.67, and credited the company with a balance of $4745.83. It does not appear to whom they sold them, but it does appear that they never took title to themselves. It is significant in this connection that, in the suit of *Stewart* v. *Lansing,* Mr. Elliott, the senior member of the firm, stated: "We did not sell the bonds at all; . . . they were negotiated by Mr. Delafield," (the treasurer of the company,) "either personally or by letter."

3. *John J. Stewart* appears as the next holder of these bonds. There is no evidence whatever to show how Stewart, who lived in New Orleans, became possessed of them, or even that he paid value for them, or that he took them without notice of their original invalidity. It does appear, however, that a suit against the town was brought in his name to recover the amount of certain overdue coupons; that judgment went for the defendant; and that such judgment was affirmed by this court in *Stewart v. Lansing*, 104 U. S. 505. It was held by this court in that case that it was clearly shown that, although Elliott, Collins & Co. "parted with" the bonds, they did not sell them, nor was the sale negotiated by the firm, and that the bonds only passed through their hands upon terms which had been agreed upon by others; that Stewart, the plaintiff, was not known to any of the witnesses examined; that no one had ever seen him; and that the sale, if actually made, was at an enormous discount. Under these circumstances, it was held that there was no such evidence of *bona fide* ownership in the plaintiff as would require the case to be submitted to the jury.

The only additional testimony in this case with regard to the ownership of Stewart tends to show that he was an actual person, well known in New Orleans, and living there. Although he appears to have been living when the testimony was taken, no effort seems to have been made to secure his deposition. There is nothing tending to show that he was a *bona fide* purchaser for value.

4. *George W. Brackenridge*, president of the National Bank of San Antonio, Texas, claims to have purchased these bonds of John J. Stewart, giving him therefor a cheque for $50,000 on the Louisiana National Bank. It is somewhat singular that this cheque was payable to and endorsed by *James* J. Stewart, and no explanation is given why, if the sale were made by John, the consideration was paid to James. Nor was the cheque produced by the witness himself, but by the cashier of the bank upon which it was drawn. In the ordinary course of business cheques are returned by the bank to the drawer, but in this case the cheque was produced by the bank five or six years after it was drawn. Mr. Brackenridge says there was no

special agreement for the purchase of the bonds; that he understood they were for sale, and had been notified that he could purchase them; that at the time he gave the cheque the bonds wₒre delivered to him in Stewart's office in New Orleans; that the conversation with Stewart made very little impression upon him at the time; and that he had not the·slightest idea that the bonds were invalid, and believed "they were like some San Antonio bonds that were held void in the state courts, but when sued on in the Federal courts they were declared legal and valid." He further stated that he had dealt heavily in Texas bonds, but had never bought any municipal bonds from other States until he bought these; and that he was not acquainted in Tompkins County before he purchased them. He was not able to state even the year he bought them of Stewart. He swears he did not open the package in which they were delivered to him, even after he had returned with them to San Antonio, and that he supposes the coupons were attached to the bonds. He subsequently cut off some of the coupons, and two actions appear to have been brought by·him upon them. Upon his examination in one of these prior cases, he stated that he purchased them upon the recommendation of Mr. Stillman of New York, and that, at the price at which they were offered, he thought they were a good purchase; that he did not know whether, in recommending the bonds, Stillman was serving himself or was serving him, and did not know whether they belonged to him or some one else; that his correspondence with Stillman was by letters, which he was unable to produce; that he gave $50,000 for the $75,000 of bonds with $26,000 of dishonored coupons attached; and that he thought he was buying a bond that was perfectly good in the Federal courts, but that recovery in the state courts would be doubtful. Upon this examination he stated that he left the bonds in the Louisiana National Bank for several months; then took them out personally, carried them to New York, took them to Mr. Stillman, who had recommended him to buy them, to know whether he bought them for his, Stillman's account, or for his own. "At the time I bought them I did not know whether it was for my account or whether he wanted some interest in

them." Stillman assured him the bonds were perfectly good, but would not say positively whether he should keep them for his own account or not. He says he wanted a definite understanding on the subject, but does not seem to have secured it. He subsequently put them in the hands of attorneys in New York to whom he had been recommended by Stillman.

The substance of this testimony is that Mr. Brackenridge went through the form of purchasing these bonds of Stewart, and gave him a check for $50,000 for them; but the testimony leaves but little doubt that the purchase was a mere form, and was made upon the advice of Stillman, and in pursuance of correspondence which was not produced. It is incredible that a man should purchase this large amount of bonds for half their face value without looking at them or even noticing whether they were signed or sealed, without making any inquiries with regard to the responsibility of the town, or the circumstances under which the bonds were issued, the non-payment of the overdue coupons, or the title of the person (to him an entire stranger) through whom he purchased them. His subsequently taking them to New York and asking Stillman whether he purchased them for his, Stillman's, account, or on his own, indicates very clearly that this was never intended as a *bona fide* investment by Brackenridge. If the bonds were valid at all, he must have known they were worth very nearly, if not quite, their face value, and the very fact that bonds to this large amount were offered for sale at this large discount, at a place two thousand miles from where they were issued, was of itself a circumstance calculated to arouse suspicion of their validity in the mind of any person of ordinary intelligence.

5. *John T. Lytle*, the plaintiff. Lytle purchased the bonds of Brackenridge. He is, and has been since 1860, a stock-raiser in Medina County, Texas, and prior to May, 1884, had acquired a tract of forty thousand acres of land on the Frio River, where he pastured some 2500 cattle. The tract was worth $4 per acre, and he owned a half interest with one McDaniel. He had been intimately acquainted with Brackenridge since 1871, and, in a conversation in 1884, agreed to sell

him one-third of his interest in the Frio property for these $75,000 of bonds. He made no inquiry with regard to the bonds, but was told by Mr. Brackenridge that they were good. The bonds were delivered to him at the San Antonio National Bank, and Lytle gave him a receipt for the one-third interest in the property. This was six or eight weeks after the agreement was made. He cut off the July coupons in time for presentation for payment, and the January coupons as they became due, and sent them to the attorneys in New York to whom Mr. Stillman had recommended Mr. Brackenridge. This was the last time he saw the bonds. The Frio property was subsequently conveyed to the San Antonio Ranch Company. It does not appear upon what day the deed was made, but as the company was not organized or chartered until January 29, 1885, it must be presumed that it was not before that time. One-third of the stock in this company was issued to Mr. Brackenridge, who was made president. Brackenridge, he says, retained no interest in the bonds.

Upon cross-examination, he says the bargain was consummated at the first interview; that ten or fifteen days thereafter he gave Brackenridge a receipt for the bonds in payment for the one-third interest in the ranch, and they were then transferred to his credit, though not actually produced. Upon the same day, and some two or three hours thereafter, he saw the bonds for the first time; there were coupons upon them, but none that were matured; he gave them to the cashier, and told him to take care of them for him, and he has not seen them since he cut off the coupons for transmission to his attorneys. In the summer or fall of 1884 he received a letter from his attorneys, informing him of some difficulty with regard to the bonds, when Mr. Brackenridge told him he had a suit pending about the coupons. He says he first learned that the town claimed to have a defence to these bonds at the time he cut off the coupons, which was about six weeks or two months after the bonds were delivered to him by Brackenridge; he further states that Brackenridge had an interest with him in another ranch, or rather cattle, worth $180,000, the title to which stood in the name of Lytle & Co., a partner-

ship.   The Frio ranch cost Lytle and McDaniel $66,000, and was deeded to the San Antonio Ranch Company, a corporation with a capital stock of $500,000, of which Brackenridge took one-third, less $60,000, which was taken out in the matter of the purchase of the property that belonged to Lytle and McDaniel before the formation of this company, in which Brackenridge had no interest.

Mr. Brackenridge swears that he wanted an interest in the Frio ranch, as it was one of the best in the country, and told plaintiff it would be better for him to take a third interest, and offered to give him these bonds; that he considered them good and worth as much as the property.   He finally accepted the proposition.   He gave practically the same account of what took place at the time that the plaintiff did; that the property was subsequently turned over to the San Antonio Ranch Company, in which he received stock to the amount of $60,000.   His testimony also indicates that, prior to the purchase of the Frio property, he had a third interest in cattle worth $180,000, having assisted Lytle and McDaniel to purchase the same by a contribution of $60,000.   These cattle, as well as the Frio ranch, made up the capital of the Ranch Company, which was valued at $500,000.

In view of the fact that a prior suit was brought upon coupons of these bonds, which was unsuccessful, and that an effort has undoubtedly been made by some one who is or was interested in them to get them into the hands of a bona fide purchaser, it is natural that their alleged ownership should be looked upon with some suspicion, and the circumstances under which they came into the hands of the present holder should be critically examined, and all the testimony upon the subject of his bona fides carefully scanned.   It is certainly an unusual proceeding for a stock farmer to trade the bulk of his property for bonds about which he knows nothing, and which he does not take the trouble to look at, upon the bare assurance of his vendor that they are good, though such vendor be his own banker, with whom he had been on intimate terms for years.   According to his story, the sale was merely an off-hand affair, not preceded by any of the negotiations which usually accom-

pany purchases of large amounts of land — the whole thing being a mere suggestion on the part of Brackenridge that he would like an interest in the ranch, and an instant acceptance of the proposition by Lytle. In his own words : "He said he had so many bonds — he said he had $75,000 of bonds that. he would give me for a third interest in my ranch — in the Frio ranch. He said the bonds were good. I told him all right ; I would sell him the third interest. He said all right; consider it a trade." "That was all that was said."

It is significant of the carelessness with which the trade was conducted, that a receipt was given for "county bonds" as "part payment for a one-third interest in our Frio ranch and stock located on the Frio River," and was signed by "Lytle and McDaniels," when the bonds were not county bonds, the payment was in full, the sale did not include the stock, and the transaction was with Lytle alone. After he had cut the coupons off he returned the bonds to the bank, where he supposed they remained ever since, though, at the time he was sworn in New York, they were produced by his attorneys and identified by him.

Granting that all these peculiarities may be explained by the confidence which an inexperienced farmer might repose in a friend of long standing, his own testimony shows that, in the latter part of the summer or in the fall of 1884, he heard from his attorneys in New York that there was some difficulty about the bonds, and that he then talked the matter over with Mr. Brackenridge, who told him that he had a suit pending about some of the coupons. And again he says: "We have talked the matter over, as I have said, at different times. I expect he explained it all to me." While he does not state fully the scope of his information, he was undoubtedly apprised of the fact that the town claimed a defence to the bonds, and that a suit upon the coupons was being contested.

It is singular as matter of fact, and fatal to a recovery as matter of law, that the plaintiff did not act upon the information thus received, and at once repudiate the transaction, and refuse to consummate the sale by a deed of the property to the Ranch Company. Instead of that, he seems to have re-

ceived the announcement with the utmost unconcern, as if it were a matter in which he had no interest, and, some time subsequent to the 28th of January following, he made a deed of the property to the Ranch Company. He made no complaint of having been misled by Brackenridge, although no court, under the circumstances, would have enforced the contract of May 24, 1884, even if it were valid under the statute of frauds.

As early as 1823, it was held by this court in *Wormley* v. *Wormley*, 8 Wheat. 421, 449, to be "a settled rule in equity that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase money." Such is undoubtedly the law. *Swayze* v. *Burke*, 12 Pet. 11; *Tourville* v. *Naish*, 3 P. Wms. 306; *Paul* v. *Fulton*, 25 Missouri, 156; *Dugan* v. *Vattier*, 3 Blackford, 245; *Patten* v. *Moore*, 32 N. H. 382; *Blanchard* v. *Tyler*, 12 Michigan, 339; *Palmer* v. *Williams*, 24 Michigan, 328; *Jackson* v. *Cadwell*, 1 Cowen, 622. It is insisted, however, that this principle has no application to the purchase of negotiable instruments like the bonds in question. We know of no such distinction, however, and in the case of *Dresser* v. *Missouri & Iowa Railway Construction Co.*, 93 U. S. 92, the rule was expressly applied to a purchaser of negotiable paper. In that case the plaintiff purchased the notes in controversy, and paid $500 as part of the consideration before notice of any fraud in the contract; and it was held that if, after receiving notice of the fraud, he paid the balance due upon the notes, he was only protected *pro tanto;* that is, to the amount paid before he received notice; citing *Weaver* v. *Barden*, 49 N. Y. 286; *Crandall* v. *Vickery*, 45 Barb. 156; *Allaire* v. *Hartshorn*, 1 Zabr. (21 N. J. Law,) 665.

While the notice received by the plaintiff may not have gone to the extent of informing him of the particular facts showing the invalidity of the bonds, he was informed that the town was contesting its liability, and that Brackenridge himself was in litigation with it over the payment of the coupons. Receiving this information as he did, not only from his vendor,

but from his own attorneys, from whom he could have learned all the facts by inquiry, it is mere quibbling to say, that he had no notice that the bonds were invalid. While purchasers of negotiable securities are not chargeable with constructive notice of the pendency of a suit affecting the title or validity of the securities, it has never been doubted, as was said in *Scotland County* v. *Hill*, 112 U. S. 183, 185, that those who buy such securities from litigating parties with actual notice of a suit, do so at their peril, and must abide the result the same as the parties from whom they got their title. Under the circumstances, it was bad faith or wilful ignorance under the rule laid down in *Goodman* v. *Simonds*, 20 How. 343, and *Murray* v. *Lardner*, 2 Wall. 110, to forbear making further inquiries. No rule of law protects a purchaser who wilfully closes his ears to information, or refuses to make inquiry when circumstances of grave suspicion imperatively demand it.

Upon the whole, it is impossible to avoid the conclusion that the purchases of these bonds by Brackenridge and Lytle were never made in good faith, but were merely fictitious, and that their real ownership is still in some one, who is affected with notice of their invalidity, and has endeavored by feigned transfers to get them into the hands of some one who can pose before the court as a *bona fide* purchaser.

The judgment of the court below is therefore

*Affirmed.*