## BRIGGS v. TOWN OF PHELPS.

(Circuit Court, N. D. New York. October 18, 1895.)

### No. 3,076.

BONA FIDE PURCHASER.

　　One B., a brother of plaintiff, and a lawyer, residing near the town of P., New York, held several bonds of the town of an issue which had been adjudged invalid some time before. Through the agency of plaintiff, who was a farmer residing in Vermont, B. borrowed $1,200 from one C., a neighbor of plaintiff, and deposited three of the bonds as collateral. Afterwards plaintiff took up B.'s notes, and received such collateral, and also bought more of the bonds from B., paying par, or nearly par, therefor. There were no overdue coupons on the bonds when sent to plaintiff, and for some time interest was paid, apparently by the town. Plaintiff and C., who were both men of unimpeached character, swore that they had no knowledge of any infirmity in the bonds. *Held*, that plaintiff was a bona fide holder of the bonds, and entitled to recover from the town the amount of the overdue coupons held by him.

This was an action by Orville H. Briggs against the town of Phelps, N. Y., upon coupons of bonds issued by the town. The case was tried by the court without a jury.

S. D. Bentley, for plaintiff.

James C. Smith and Thomas H. Bennett, for defendant.

COXE, District Judge. This action is to recover upon 170 coupons of the bonds of the defendant purporting to be issued in aid of the Sodus Point & Southern Railroad. There is but one question in controversy, viz.: Is the plaintiff a bona fide holder? The bonds in question were delivered by the town commissioners to the railroad company on the 10th of October, 1870. On the 2d of January, 1871, the supreme court of New York, upon proceedings commenced in July, 1870, rendered a decision invalidating the bonds. This judgment was, on the 26th of June, 1871, affirmed by the court of appeals. The railroad company retained the bonds until February 12, 1872, when they were delivered to Charles J. Pusey, the contractor who was building the road. Concededly neither Pusey nor the railroad company was a bona fide holder. The plaintiff's title runs through Pusey, Connett, Seaman and James E. Briggs, a brother of the plaintiff.

It appears from the testimony, offered on behalf of the plaintiff, that in February, 1877, James E. Briggs received the bonds in suit from Seaman. In the same year, and prior to April, through the agency of the plaintiff, he borrowed $1,150 or $1,200 of Ruell Covell, of Vermont, for which he gave Covell his two notes of $600 each and placed in his hands, as collateral security, three of the bonds in question. During the succeeding year the plaintiff became the owner of the bonds by purchasing two of his brother James and by taking up his brother's notes in Covell's hands. The bonds were paid for partly in cash and partly by transferring to James, pursuant to a family settlement, certain notes of a younger brother which were held by the plaintiff. It is not deemed necessary to discuss the history of these bonds prior to their transfer to Covell and the plaintiff, for the reason that they must be regarded as bona fide holders. The considerations which induce the court to reach this conclusion may be briefly summarized as follows:

First. There is nothing inherently suspicious or improbable in the transfer to Covell and the plaintiff. It is not the case of an astute and resourceful banker attempting to pose as the bona fide holder of $75,000 of invalid bonds which were discredited by $26,000 of dishonored coupons being attached thereto at the time of purchase. Lytle v. Lansing, 147 U. S. 59, 13 Sup. Ct. 254. The entire transaction, so far as the two Vermonters is concerned, was reasonable, natural and in no way out of the ordinary course of dealing.

Second. That Covell actually advanced $1,150 is beyond dispute, and the testimony is clear and uncontradicted that the plaintiff paid par, or nearly par, for the bonds. The court must permit suspicion of the vaguest kind to usurp the place of proof in order to reach the conclusion that the transaction with Covell and the plaintiff was a mere fiction. If they had knowledge of the invalidity of the bonds it is hardly conceivable that these hard-fisted farmers would have risked their savings in the venture. They were, then, upon the uncontradicted evidence, holders for value.

Third. It is not pretended that at the time Covell received the bonds as security for the $1,200 loan he had knowledge of any infirmity in the bonds. He was, then, at this time not only a holder

for value, but a holder without notice; in short, a bona fide holder. Sayles v. Garrett, 110 U. S. 288, 4 Sup. Ct. 90.   There is some testimony to show that while Covell still retained possession of the bonds he and the plaintiff had notice that there was to be a contest regarding them.   Without considering the effect which this notice would have upon the bona fides of the transaction, if given in the circumstances suggested by the defendant, it is enough to say that the great preponderance of evidence is to the effect that when the notice was given, in the summer or autumn of 1882, the plaintiff was, and for some time had been, the legal owner of the bonds.

Fourth. Covell and the plaintiff were farmers in Vermont.   The latter had at one time taught school and was a soldier in the war of the Rebellion.   They had prospered in a small way and were men of truth and honor.   There is absolutely nothing in their former lives, so far as disclosed by the record, to indicate that they would enter into a conspiracy to defraud the defendant and support it by deception and perjury.

Fifth. The plaintiff's brother who sent him the bonds was a lawyer living in the immediate vicinity of the town of Phelps.   Presumably he had cognizance of all the facts.   What more natural than that the plaintiff, a farmer, living in another state, hundreds of miles from the scene of bonding, and having no knowledge of the facts, should rely upon the judgment of his brother who, by profession and residence, was well qualified to express an opinion on both the law and the facts?

Sixth. There were no overdue coupons on the bonds or anything about them to excite suspicion or inquiry.   For some time after they were sent to the plaintiff the interest was paid in circumstances which might well have led him to believe that it was paid by the town.

Seventh. All of the parties to the transfer are men of standing and character.   They all swear to a state of facts which demonstrate the good faith of the transaction.   There is no reason for disbelieving them.   The plaintiff has sworn that he had no knowledge of any defect in or defense to the bonds and that when he took them he "believed them to be valid and as good as so much gold."   There is nothing in the record to justify the court in pronouncing this testimony false.

These reasons might be elaborated still further and others stated, but it is not necessary.   The court does not overlook the various facts and presumptions of which the defendant predicates its attack on the plaintiff's good faith.   It is sufficient that in order to find with the defendant the court must disregard undisputed testimony and erect in its place a fabric based largely on inference and suspicion.

No part of the cause of action is barred by the statute of limitations.   A coupon partakes of the nature of the bond to which it was attached and is not outlawed until the bond itself is outlawed.   Lexington v. Butler, 14 Wall. 282, 296.

The plaintiff is entitled to judgment of $2,975 with interest and costs.