Rockingham, ⎱
　Feb. 2, 1904. ⎰

## HALLOCK *v.* YOUNG *&* *a.*

In an action by an indorsee against the maker of a promissory note obtained by fraud on the part of the original payee, it is incumbent upon the plaintiff to prove that he is a *bona fide* holder for value, and that he obtained the note before maturity in the regular course of business, without knowledge of the infirmity or of facts which would reasonably put him upon inquiry concerning the same.

In such action, the question of the plaintiff's good faith in purchasing the note is properly submitted to the jury unless the circumstances attending the transaction, as disclosed by the evidence, are so uniformly and convincingly in his favor that fair-minded men could not arrive at an opposite conclusion.

The purchaser of a promissory note is not bound to make inquiries as to the character and financial standing of the parties thereto, nor to investigate for the purpose of ascertaining whether a suspicion concerning the validity of the paper is well grounded ; but his failure to act with reasonable prudence, although insufficient of itself to deprive him of the rights of a *bona fide* holder, may properly be considered by the jury upon the question of his good faith in the transaction.

A statement of fact in closing argument, unsupported by any evidence in the case and prejudicial to the adverse party, furnishes sufficient cause for setting aside a verdict, in the absence of a finding that the jury were not influenced thereby.

ASSUMPSIT, upon three promissory notes. Trial by jury and verdict for the defendants. Transferred from the April term, 1903, of the superior court by *Stone*, J.

The notes were for $500 each, dated September 29, 1898, payable to H. J. Goss or bearer in one, two, and three years from date, respectively, and signed by the defendants (eight in number), whose promise was joint and several. The sum of $500 was indorsed upon them, and they were indorsed in blank by Goss. The plaintiff testified that he purchased them of Goss in November, 1898, and gave for them a " thoroughbred Cleveland " imported stallion and $600 in cash. The evidence tended very strongly to prove that the notes were invalid as between the defendants and Goss, because of the latter's fraud in the transaction out of which they originated—the sale of a stallion to them for $1,500.

Goss and the defendants reside in New Hampshire, and the note was given here. The plaintiff resides in Riverhead on Long Island, New York. He is forty-five years old, a farmer, and never bought a note before. He had no knowledge of the defendants, excepting that Goss told him some of them were farmers, one was a shoe manufacturer, one an aged man retired from business, and one a hotel keeper. He did not know Goss, and had no knowledge concerning him, or his financial responsibility, excepting that one Cooper, president of the Suffolk County National Bank of Riverhead, recommended him as a man with whom he would himself deal. Cooper testified as follows: " Mr. Goss was introduced to me by a gentleman from New London,—and our bank has the reputation of being pretty easy to get money out of,—and they came there to get money ; and I was an old farmer before I went into this business and was n't much of a bank man, but I did n't think they were hardly bank notes, so I declined to buy them ; and they wanted to know if I could n't find somebody that would buy them ; and in the conversation I spoke about this gentleman, Mr. Hallock, having a nice stallion that he might buy perhaps, and

I took him up there to see the horse; and he and Mr. Hallock made a bargain, and he came down to the bank, and I told Mr. Hallock what I had heard of Mr. Goss. I thought he was all right, and I supposed the notes were all right." On cross-examination, Cooper testified that he had heard of Goss once or twice before; that he had heard that Goss had been in the vicinity with the New London man once trying to sell a horse—getting up companies to buy a horse; and that this, with the introduction by the New London man, was all he knew about him. The plaintiff, when asked where the purchase of the notes took place, replied: "Somewhere there in the neighborhood; I do n't recall where."

The plaintiff further testified that he left the notes at the Suffolk County National Bank; that as each one became due it was sent forward by the bank for collection, and not being paid, was protested; that he did not indorse them; that after the return of the second note unpaid, he sent the assistant cashier of the bank here to see if the notes were of any value, and the latter reported that the makers were able to pay, but refused to do so; that after the last note was returned, the assistant cashier sent them to an attorney in this state for collection; that the assistant cashier wrote to Goss, but got no reply, and no further steps were taken to find him. This action was not brought until after the last note was protested. The first letters sent by the attorneys to the defendants, notifying them that the attorneys had the notes for collection, stated that the claim was in favor of Goss. One of the attorneys testified that this was in consequence of an error of their stenographer, and as soon as discovered it was corrected by sending new notices stating that the claim was in favor of the plaintiff. The plaintiff's motion that a verdict be directed in his favor was denied, subject to exception.

The defendant's counsel in his argument to the jury referred to the plaintiff as "the man who foisted upon the innocent public the notorious horse Magnet." He also said: "Did n't Mr. Cooper, the bank president, who admits he is easy, but not so easy as all that and would n't take the note,—did n't he recommend this man Hallock to a man he knew to be a horse jockey? Was n't his mission in this case to bring two horse jockeys together?" The plaintiff excepted to each of these statements. He testified, in reply to the defendants' counsel, that he thought he was not a horse jockey; that he had not bought and sold horses; that he had probably sold within fifteen years three colts that he raised himself; and that the stallion sold Goss was named Magnet. The examination then continued as follows: *Q.* "Oh! that was Magnet. Aint you heard what became of Magnet?" *A.* "No sir." *Q.* "Why, Mr. Hallock, don't you know what became of the celebrated imported stal-

lion Magnet, with the pedigree? Do n't you know what became of that in New Hampshire?" *A.* "I was indirectly informed that Mr. Goss had parted with Magnet, but —" *Q.* "Parted, how?" *A.* "I do n't know." *Q.* "Did you get any note with that horse, signed by fourteen farmers?" *A.* "No sir." *Q.* "You do n't know who he sold it to?" *A.* "No sir; the horse parted my company." *Q.* "That is the celebrated horse Magnet, and that came from you, did it, and —." The plaintiff then objected, and the examination on this line ceased.

*G. K. & B. T. Bartlett,* for the plaintiff.

*Page & Bartlett,* for the defendants.

CHASE, J.  The defence made to the notes was that they were invalid because of Goss' fraud in obtaining them; and the verdict shows that the fraud was proved. There being this infirmity in the notes originally, the plaintiff, to entitle himself to a verdict, must prove that he was a *bona fide* holder of them for value, and obtained them before maturity in the regular course of business, without knowledge of the infirmity or of facts that would reasonably put him upon inquiry concerning the same.  *Clark* v. *Pease,* 41 N. H. 414, 428; *Garland* v. *Lane,* 46 N. H. 245; *Perkins* v. *Prout,* 47 N. H. 387; *Savage* v. *Goldsmith,* 181 Mass. 420; *Lytle* v. *Lansing,* 147 U. S. 59. Mere suspicion on his part that there was infirmity in the notes would not be sufficient to show that he was not a *bona fide* holder, or to put him upon inquiry concerning their original character.  *Perkins* v. *Challis,* 1 N. H. 254; *Crosby* v. *Grant,* 36 N. H. 273, 281; *Green* v. *Bickford,* 60 N. H. 159; *Limerick Nat'l Bank* v. *Howard,* 71 N. H. 13; *Smith* v. *Livingston,* 111 Mass. 342; *Goodman* v. *Simonds,* 20 How. 343. The question as to the character of his holding arises upon his motion to have a verdict directed in his favor. His exception to the denial of the motion raises the question whether there was any evidence before the jury from which they could properly find that he was not a *bona fide* holder.

The evidence relating to the character of his holding comes mostly from the plaintiff himself and his witness, Cooper. It is, in substance, that he purchased the notes of Goss before their maturity, with no knowledge concerning the character and financial ability of the makers, except what Goss gave him, and no knowledge of Goss' financial ability, and slight and apparently very unreliable knowledge of his character, and gave therefor a horse and $500 in money. If this truly represents the transaction, the plaintiff is a *bona fide* holder of the notes within the meaning of the law

of this state. He was not required, as a matter of law, to make inquiries concerning the character and financial standing of the parties to the notes, nor to act as a reasonably prudent person would act in making the purchase. Even if the circumstances excited his suspicion concerning the validity of the notes, the law did not require him to desist from the purchase on that account, nor to investigate the matter with a view of ascertaining whether his suspicion was well grounded or not. All that was required of him was that he should act honestly and in good faith. If he so acted, his title with its attendant rights must be upheld, although his action was imprudent and unusual. It was said in the leading case on the subject in this country, that " every one must conduct himself honestly in respect to the antecedent parties when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not willfully shut his eyes to the means of knowledge which he knows are at hand, . . . for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith." *Goodman* v. *Simonds*, 20 How. 343, 366. See, also, *Lytle* v. *Lansing*, 147 U. S. 59, 71. While negligence of the holder, though gross, will not of itself deprive him as matter of law of the character of a *bona fide* holder, it may be evidence of bad faith. *Goodman* v. *Harvey*, 4 A. & E. 870. See, also, *Canajoharie Nat'l Bank* v. *Diefendorf*, 123 N. Y. 191. Suspicious circumstances attending the transaction, though, as above stated, insufficient in and of themselves to prevent the holder from having the rights of a *bona fide* holder, are proper matters for the consideration of the jury on the question of his good faith. *Smith* v. *Livingston*, 111 Mass. 342, 345; *Sullivan* v. *Langley*, 120 Mass. 437. In applying the general rule by which such evidence is competent upon questions of good faith, the law does not except a case of this kind.

It is said in behalf of the plaintiff that his testimony is not contradicted and consequently should be accepted as the truth. Whether it shall be so accepted or not is, under the circumstances disclosed by the case, a question of fact, to be determined by the jury, and not a question of law. " They were at liberty to disregard it altogether, if in their judgment it was intrinsically improbable, or if it was stamped with or inherently furnished indications of unreliability." *Williams* v. *Huntington*, 68 Md. 590,—13 Atl. Rep. 336; *Canajoharie Nat'l Bank* v. *Diefendorf*, 123 N. Y. 191, 200. To determine its quality as to truthfulness, they were at liberty to take into consideration the selfish interests of the witness, his appearance upon the stand, the consistency of one portion of his testimony with other portions and with facts otherwise

proved, and the reasonableness of the testimony, viewed in the light of their general knowledge derived from experience and observation in the affairs of life. There comes to mind in this connection the plaintiff's answer to the inquiry as to where the purchase of the notes took place,—that it was "somewhere there in the neighborhood; I do n't recall where." The jury might think that a farmer, who had never purchased a note before, would be able to be more definite with reference to such an important transaction, occurring only a little more than four years previously. The circumstances that the plaintiff took no steps to ascertain whether the notes could be collected of the makers until after the second one was returned protested,—this being about a year after the first one was returned unpaid,—that he brought no action upon the notes until after they all became due, and that he took very little interest in looking up Goss, were proper matters for consideration upon the question of the good faith of his holding of the notes. There were other circumstances disclosed in the testimony having a bearing that was adverse to the plaintiff's position, but it is unnecessary to specify them. It is sufficient for the present purposes that the evidence was not uniformly and convincingly in favor of the plaintiff, but was such that impartial and fair-minded men, upon consideration of it, might properly find one way or the other, according as they regarded its character as to truthfulness and weight. The circumstances of the transaction were such that the question of the plaintiff's good faith in acquiring title to the notes was peculiarly appropriate for the determination of a jury, under proper instructions relating to the plaintiff's rights. As no exceptions were taken to the court's charge to the jury, it must be assumed that it was satisfactory to the parties. The plaintiff's exception to the denial of his motion to direct a verdict in his favor is overruled.

Another question for consideration is whether the conduct of counsel in the closing argument was within the province of legitimate advocacy; and if not, whether it was prejudicial to the plaintiff and so rendered the trial unfair. There was evidence that Goss and the plaintiff each dealt in horses to some extent; that Goss cheated the defendants in the sale of the stallion for which they gave the notes in suit; that Cooper heard he once attempted to sell a horse to a company in the vicinity of Riverhead; that the plaintiff imported the stallion which he sold to Goss, and had sold a few other horses which he raised. In view of this testimony, it cannot be held that counsel went outside his legitimate province in the instance to which the last exception was taken. The most that can be said of it is that he went dangerously near the line. But it is beyond question that the counsel crossed the line when

he made reference to the plaintiff as "the man who foisted upon the innocent public the notorious horse Magnet." This statement forcibly implies that the horse was notable in a bad sense, and charges the plaintiff with palming him off on the public as a kind of horse that he was not in fact. There was no evidence whatever that the horse was notable in a bad sense, except perhaps in the implications contained in some of the counsel's questions to the plaintiff; nor that the plaintiff made any representations in relation to him that were not true; nor as to what became of him, whether he has troubled the public or not. The statement is not an argument based upon facts that were proved, but is a statement of facts that were not proved. It had a natural tendency that was prejudicial to the plaintiff in two ways: it tended to prove that the plaintiff did not give full value for the notes, and that he was a dishonest man. As the counsel did not withdraw the remark when his attention was called to it by the exception, and procure a finding of the court that it did not prejudice the plaintiff in fact, as is required by the well established rule of law in order to cure such an error, the verdict must be set aside in consequence of it.

*Exception as to the statement of counsel in argument sustained: the other exceptions overruled.*

All concurred.