BECHTEL TRUST CO. et al. v. IOWA–WISCONSIN BRIDGE CO. (KENDRICK et al., Interveners).

No. 220.

District Court, N. D. Iowa, E. D.

Dec. 1, 1936.

Supplemental Opinion Jan. 5, 1937.

On Petitions for Rehearing March 4, 1937.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, Iowa (formerly Bradshaw, Schenk & Fowler), for plaintiffs.

F. A. Ontjes, of Mason City, Iowa, and Chas. N. Dohs and Wm. C. Green, both of St. Paul, Minn., for interveners.

H. Haehlen, of Waukon, Iowa, for Iowa-Wisconsin Bridge Co.

W. B. Sloan, of Des Moines, Iowa, and Senneff, Bliss & Senneff, of Mason City, Iowa, for Phoenix Finance Corporation.

SCOTT, District Judge.

This is a suit in equity by trustees under a trust deed, purporting to secure a $200,000 issue of bonds, and that purports to convey to the trustees an interstate bridge across the Mississippi river from the town of Lansing in Allamakee county, Iowa, to a point on the opposite Wisconsin shore. Plaintiffs' bill alleges default and a breach of condition in failure to pay the principal of two bonds of $5,000 each, the interest upon the entire issue, and the taxes on the bridge. The defendant, Iowa-Wisconsin Bridge Company, hereinafter referred to as the Bridge Company, appeared timely and answered the bill, alleging, in substance, that a majority of the stock of the Bridge Company was owned by directors and stockholders of the Phoenix Finance System, Inc., who were also officers and directors of the Bridge Company, and that the bonds were issued to the Phoenix Finance System, Inc., in exchange for stock in the Bridge Company unlawfully surrendered and returned to the Bridge Company. Not much progress was made under this answer and later Fayette D. Kendrick, a stockholder in the Bridge Company and certain other stockholders, were permitted to intervene and join as defendants, and the petition of intervention of such stockholders by order was permitted to stand as an answer in behalf of the Bridge Company. After process of amendment, this pleading, after alleging the necessary jurisdictional facts, as a defense alleges in substance that at the time of the execution of the trust deed and the issuance of the bonds the Bridge Company was in complete control of one John A. Thompson who controlled a majority of its voting stock and who controlled its officers and board of directors, and who was also the president and owner of a controlling interest in the Phoenix Finance System, Inc., and controlled its officers and board of directors, and other subsidiary companies; and that the said Thompson in fraudulent conspiracy with others who were officers and directors of the Bridge Company, and also officers and directors of Phoenix Finance System, Inc., planned and schemed to acquire the ownership of said bridge to the exclusion of the Bridge Company and its other stockholders, and as a part of such fraudulent scheme and plan caused the bonds in question to be issued and the trust deed purporting to secure the same to be executed without lawful consideration to the Bridge Company, and particularly that the said John A. Thompson caused approximately $60,500 in bonds to be issued in exchange for stock in the Bridge Company unlawfully surrendered by him or his controlled company, Phoenix Finance System, Inc.; and caused to be built up on the books of the Bridge Company a false and fictitious account in the sum of approximately $97,000, indicating and declaring in substance that the Bridge Company owed Phoenix Finance System, Inc., such sum, and caused bonds in that aggregate amount to be issued without consideration to the Bridge Company; and other things done and accomplished by said John A. Thompson in pursuance of said fraudulent conspiracy to the end that said trust deed and all of said bonds so issued are fraudulent and void.

After issue joined, by order of the court in pursuance of agreement of parties, the cause was referred to Hon. James W. Kindig, as special master in chancery, to hear and report the evidence with findings of fact and conclusions of law in pursuance of the existing Equity Rules. The master qualified and proceeded with his long and arduous task and, after fifty-five days devoted to the taking of testimony, filed his report which with the exception of a number of comparatively minor items aggregating in all approximately $27,000, found the issues for the defendant and interveners.

In due time the trustees, plaintiffs, and Phoenix Finance Corporation, successor to Phoenix Finance System, Inc., which in the meantime had become a party plaintiff to

the suit, filed exceptions to the report of the master. The defendants also filed certain exceptions to the findings of the master unfavorable to them. The cause then came before the court ·upon the various exceptions to the master's report, which were submitted after oral arguments and very voluminous and complete briefs by all parties.

■ The master. in his report, after reciting briefly the historical features of the case and the issues as defined by the pleadings; makes fourteen specifically numbered findings of fact. I shall here refer to them in their numerical order.

Finding 1. That on February 20, 1932, the Bridge Company executed the trust. deed as of date, however, January 1, 1932, to secure a bond issue of $200,000, and complainants were named as trustees.

Finding 2. That the Bridge 'Company as of January 1, 1932, purported to authorize the issuance of $200,000 of bonds.

Finding 3. That the principal on the bonds, together with interest and taxes, as alleged in the complaint, are in default.

Finding 4.

' (a) That John A. Thompson before the issuance of the bonds or authorization of the trust deed came into .control and management of the Bridge Company.

(b) That during all of that time and thereafter said Thompson also controlled the Phœnix Finance System, Inc., and affiliated companies.

Finding 5. That notwithstanding certain inhibitory provisions in its charter, the Bridge Company, through the influence of Thompson and his associates, caused $60,-500 of bonds to issue to Thompson or Phœnix Finance System, Inc., in exchange for Class A stock held by him, without giving like opportunity to other stockholders.

Finding 6. That the issuance of said bonds in consideration of the surrender of the said shares impaired the capital of the Bridge Company, and was in violation of a statute of Delaware under which the Bridge Company was incorporated.

Finding 7. That the action of Thompson in promoting such exchange of shares for bonds was fraudulent and for the purpose of conferring upon himself a preference over other holders of Class A stock.

Finding 8. That $97,000 of the bonds were transferred by the Bridge Company to Thompson or his controlled companies on a pretended book account originating out of a pretended mortgage for $50,000 covering an obligation which J. W. Shaffer & Co. was in duty bound to perform under its construction contract, and which contract provided for a surety company performance bond, which Thompson permitted Shaffer & Co. to omit to furnish. That. Thompson and his companiés did not, in fact, perform the obligation on behalf of Shaffer & Co., but built up a pretended account to make ·it falsely appear that Shaffer & Co. failed in its duty, and that Thompson and his controlled companies expended $97,000 in such performance. But as a matter of fact, Thompson and his controlled companies only expended $9,000 in payment to a subcontractor in settlement of a mechanic's lien, and that $88,000 of said $97,000 of bonds. was without consideration.

Finding 9. That resolutions pretended to have been passed by the Bridge Company authorizing said $97,000 issue of bonds were not genuine and legal resolutions so far as they related to $88,000 of the $97,000 issue, but were procured through the influence and connivance of Thompson and his associates, and that independent directors and stockholders voting in support of such resolutions were deceived and misled by misrepresentations of Thompson. '

Finding 10. .

(a) That of said bonds the Bridge Company received full consideration for the said $9,000 thereof paid in settlement of the mechanic's lien.

(b) That of $7,400 of bonds issued to Helmer N. Anderson, the Bridge Company received consideration only of $6,000.

(c), (d), (e), (f), and (g) were five $1,000 bonds issued in settlement and compromise of five disputed claims, and the Bridge Company received full consideration.

(h) Respecting $10,000 of bonds issued to Bradshaw, Schenk & Fowler, attorneys, to secure two notes aggregating $4,000, the Bridge Company received consideration to the extent of $4,000.

(i) That the remaining bonds, approximating $19,000 or $20,000, were issued to the Phœnix Finance Corporation as security for a note of $3,125 given in part to secure an advance for the payment of taxes of the Bridge Company, and that said bonds were valid only to the extent of said note.

(j) That of the bonds held by Bradshaw, Schenk & Fowler, in the amount of

approximately $6,000 are without consideration and invalid.

(k) That of the bonds above issued to Phœnix Finance Corporation to secure the note of $3,125, approximately the sum of $16,975 are without consideration and obtained by fraud and invalid.

Finding 11. That Thompson, speaking for himself and the Phœnix Finance System, Inc., and his other affiliated institutions, admitted that he and his institutions owned at least 90 per cent. of the total $200,000 bond issue, and now hold the same.

Finding 12. That as alleged in paragraph 18 of the petition of intervention, any demand before the commencement of this suit that might have been made by the interveners to obtain relief from the issuance of said bonds from and through the defendant corporation would have been unavailing.

Finding 13. That the Bridge Company was not making, and would not have made, a good faith defense to the complainants' action had not the interveners intervened.

Finding 14. That the interveners and defendant are not estopped to make their defense. That the purported ratification and estoppel claimed by complainants was brought about through connivance and control by said Thompson, as was the original conspiracy and fraud, and that so far as independent stockholders and directors are concerned, they did not know of the fraud and conspiracy when taking action.

I have not undertaken to quote the master's language, but have given the substance of each finding somewhat condensed.

The master in his report returned twelve numbered conclusions of law. I shall now quote these in their entirety with the master's citation of authority:

"1. That by the introduction into the record of the deed of trust and evidence of the issuance of the bonds thereunder, the complainants have made out a prima facie case.

"2. When a suit, as in the case at bar, is brought in the interests of one (Thompson) who holds or controls the majority of the stock in the defendant corporation, and his interest in the suit is against the interest of the corporation, and the directors (except director Haehlen) of the corporation failed, as in this case, to defend in good faith, the interveners in the case at bar, as stockholders, may intervene and defend in behalf of the corporation. Fletcher, on Corporations, Vol. 13, § 5853; Whittaker v. Brictson Mfg. Co. (C.C.A.8) 43 F. (2d) 485; Mecartney v. Guardian Trust Company (C.C.A.8) 280 F. 64; Delaware & Hudson Co. v. Albany & Susquehanna Railroad Company, 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862; Federal Equity Rule 27 (28 U.S.C.A. following section 723).

"3. Although in the case at bar the mortgage on the property of the defendant, Bridge Company, is in the nature of a deed of trust to secure bonds, yet so far as the defense here involved is concerned the position of the complainants is analogous to an attempt on the part of the plaintiff to foreclose an ordinary mortgage securing a note, and fraud and want of consideration are available to the defendant and interveners against the complainants and alleged bondholders. 41 Corpus Juris, 283, § 8; Shillaber v. Robinson, 97 U.S. 68, 24 L.Ed. 967; Fletcher, on Corporations, Vol. 7, p. 341, § 3179; Fletcher, on Corporations, Vol. 7, p. 428, § 3262, also § 3278; 8 Corpus Juris, p. 984, § 1292; Lytle v. Town of Lansing, 147 U.S. 59, 13 S.Ct. 254, 37 L.Ed. 78.

"4. Where, as in the case at bar, Thompson, a stockholder and director in the Bridge Company, and also a stockholder and director of the Phoenix Finance System, Inc., and affiliated companies, gained a personal advantage as he did in the bond issue while he as such stockholder and director controlled both the Bridge Company and the Phoenix Finance System, Inc., and affiliated Companies, the burden was upon him to show that the transactions between the Bridge Company and the Phoenix Finance System, Inc., and affiliated companies were entirely fair, free from fraud and overreaching. Fletcher, on Corporations, Vol. 3, p. 307, § 944; Tower-Hill-Connellsville Coke Co. v. Piedmont Coal Co. (C.C.A.) 64 F.(2d) 817, 91 A.L.R. 648; Corsicana National Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; Washburn et al. v. Green et al., 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516; Globe Woolen Co. v. Utica Gas & Electric Company, 224 N.Y. 483, 121 N.E. 378; Fletcher, on Corporations, Vol. 3, pp. 355, 356, § 973; Backus v. Finkelstein (D.C.) 23 F. (2d) 357; Thomas v. Brownville, Ft. K. & P. Ry. Co., 109 U.S. 522, 3 S.Ct. 315, 27 L.Ed. 1018; Jones v. Missouri-Edison Elec-

**132**

tric Co. (C.C.A.) 144 F. 765; Heim v. Jobes (C.C.A.) 14 F.(2d) 29; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328; Fletcher, on Corporations, Vol. 3 p. 298, § 937.

"5. That under the facts above found, it is apparent as a matter of law that the complainants did not furnish the necessary proof to sustain the validity of the bonds, except the bonds specifically named in paragraph ten of the findings of fact, and the prima facie showing made in the first instance by the complainants has been overcome by evidence of the defendant and interveners except as to those bonds especially named as having consideration in paragraph ten of the findings of fact, and all the said bonds not named in said paragraph ten of the findings of fact as having consideration, are illegal and void because they were issued fraudulently.

"6. That excluding the said bonds specifically mentioned in paragraph ten of the findings of fact as having consideration, approximately $112,375.00 of the balance of the said bonds issued to the said Thompson and his companies, not in exchange for stock but on a fraudulently alleged consideration purporting to appear upon the books of the Iowa-Wisconsin Bridge Company, were issued without legal consideration and are therefore void. (See cases above cited).

"7. That the issuance of the said bonds, amounting to approximately $112,375.00, last named, to the said Thompson or the Phoenix Finance System, Inc., or other affiliated companies and others, was void regardless of the said lack of legal consideration because such bonds under the circumstances were, under the findings of fact above named, fraudulently obtained, except that the said bonds held as excessive security by the said Bradshaw, Schenk & Fowler, named in paragraph ten of the findings of fact, were not fraudulently obtained but are being held without consideration except insofar as the same are held as security for the two notes named in said paragraph ten of the findings of fact.

■ "8. That at the time of the bond issue in question and at the time Thompson, for himself or his controlled companies, caused the Bridge Company to transfer to himself or to his controlled companies approximately $60,500.00 of Class A preferred stock of the Bridge Company for that amount of the bonds of the Bridge Company, it was the law of Delaware that a corporation, as the

Bridge Company in the case at bar, could not purchase its own stock, when, as was the case here, the use of its funds so to do caused an impairment of the capital of the corporation. See section 19, General Corporation Laws of Delaware (Rev.Code Del. 1935, § 2051).

■ "9. That under the Articles of Incorporation of the Bridge Company at the time the Class A stock belonging to Thompson or to his companies was exchanged for the bonds of the Bridge Company, there was in existence a provision in the Articles of Incorporation of the Bridge Company making the transaction illegal and void because neither all the stock of like kind was redeemed at said time, nor was the portion thus redeemed duly called by lot after due notice, so as to provide fairness and equality between like stockholders.

"10. That because such exchange of stock for bonds was done for the sole advantage of the said Thompson and his companies and to the disadvantage of the other like stockholders, the transaction was fraudulent and voidable. (See cases above cited).

"11. That in view of the fact that the said Thompson and his companies were not (except as hereinafter stated) good faith purchasers of any of the said bonds for a valuable consideration, and in view of the fact that the said Thompson and the said companies now own at least ninety percent of the said $200,000.00 bond issue, such portion of the said bonds cannot be enforced in this foreclosure proceeding by the complainant, except that the bonds named in paragraph ten in the findings of fact as having been issued in good faith and for a consideration are valid and may be enforced accordingly.

■ "12. That the defendant and interveners are not estopped from making the defenses set forth in the answer and crosspetition because, so far as Thompson and the stockholders and directors under his control are concerned, the same fraudulent influence vitiated the alleged ratification that vitiated the original transaction, and, so far as the independent stockholders and directors are concerned, they did not know of the fraud of Thompson at the time they are alleged to have voted for the purported ratification."

As I have stated, the plaintiff trustees and their coplaintiff, Phœnix Finance Corporation, filed exceptions to the master's report separately, but inasmuch as the plain-

tiff trustees as their second exception adopted all of the exceptions of Phœnix Finance Corporation, I shall first enumerate the exceptions interposed by Phœnix Finance Corporation. I shall not attempt to quote the exceptions at large as they are prolix and argumentative:

Phœnix Corporation's exception No. 1 challenges the master's finding of fact No. 4(a), which is to the effect that John A. Thompson before the issuance of the bonds or the authorization of the trust deed came into control and management of the Bridge Company.

Phœnix Corporation's exception No. 2 challenges the master's finding of fact No. 4(b), that during all of that time and thereafter John A. Thompson controlled the Phœnix Finance System, Inc., and affiliated companies.

Phœnix Corporation's exception No. 3 challenges generally the master's findings of fact numbered 5, 6, 7, 8, 9, and 10, which findings are in effect findings of fraud on the part of Thompson and his controlled officers and directors in bringing about the issuance of the bonds and the execution of the trust deed in question.

Phœnix Corporation's exception No. 4 challenges the master's findings of fact numbered 5, 6, and 7, in disallowing and holding void $60,500 of bonds transferred to Phœnix Finance System, Inc.

Phœnix Corporation's exception No. 5 challenges the master's findings of fact numbered 8 and 9, in which the master found only $9,000 of the $97,000 issue of bonds to have been issued for a consideration; and that the resolutions relating thereto were the result of influence and connivance on the part of Thompson and his associates.

Phœnix Corporation's exception No. 6 challenges the master's findings of fact Nos. 10(i) and (k), in finding "$19,000 to $20,000" pledged to Phœnix Finance Corporation to secure a note of $3,125, invalid and without consideration except to the extent of $3,125.

Plaintiffs then except separately to each of the master's conclusions of law and to each of the master's recommendations.

Plaintiff trustees, in addition to the adoption of all exceptions of the Phœnix Finance Corporation, interpose particular exceptions as follows:

Trustees' exception No. 1 challenges generally the report of the master for as-suming to consider and pass upon the validity of any of the bonds; it being the plaintiffs' contention that the master should have considered the validity of the trust deed and whether the plaintiffs were entitled to foreclose the same for any amount, and then thereafter to give each and all of the bondholders separate hearings upon the validity of the bonds held by them.

Numerous other exceptions were interposed by the plaintiff trustees which I think need no separate consideration in this opinion, inasmuch as the questions presented are all involved in the exceptions of the Phœnix Finance Corporation adopted by the plaintiff trustees.

The defendant and interveners filed eleven exceptions to the report of the master, but later withdrew exceptions 1, 2, 5, and 10. The exceptions not withdrawn are:

Defendant and interveners' exception 3: This exception challenges the master's finding of fact No. 10(d), that the $1,000 bond issued to J. W. Dempsey was based upon a consideration and valid.

Defendant and interveners' exception 4: This exception challenges the master's finding of fact No. 10(e), that the $1,000 bond issued to the Lyle Sign Company was based upon a consideration and valid.

Defendant and interveners' exception 6: This exception challenges the master's finding of fact No. 10(g), that the $1,000 bond issued to Cobb, Hoke, Benson & Faegre, attorneys was based upon a consideration and valid.

Defendant and interveners' exception 7: This exception challenges the master's finding of fact No. 10(h), that the $10,000 of bonds issued to Bradshaw, Schenk & Fowler, attorneys, as security for two notes aggregating $4,000, were received for a consideration and valid.

Defendant and interveners' exception 8: This exception challenges so much of the master's fifth conclusion of law as makes the following exception to such conclusion: "Except the bonds specifically named in paragraph 10 of the findings of fact"; and to so much of the master's seventh conclusion of law as makes exception to such conclusion; and to so much of the master's eleventh conclusion of law as makes exception to such conclusion, because the record does not warrant the exceptions.

Defendant and interveners' exception 9: This exception challenges paragraph 2 of

the master's recommendations containing the following, to wit:

"That the said Bill of Foreclosure of the said complainants, so far as it relates to the said bonds named in paragraph ten of the findings of fact as being based upon a consideration, should not be dismissed, but the prayer of foreclosure therein made should not be granted; that is to say, the deed of trust mentioned in the Bill of foreclosure so far as it relates to the bonds named in this recommendation, amounting to $27,125.00, should be foreclosed."

Defendant and interveners' exception 11: This exception challenges paragraph 4 of the master's recommendations relative to the proportioning of costs.

Disposition of the exceptions to the master's report has required a careful review and consideration of the entire record. It is fitting that somewhat of the corporate history preceding the issuance of the bonds in controversy should be here stated. Early in the year 1928, a group of business men of the town of Lansing, Allamakee county, Iowa, hereinafter referred to as the Lansing· Bridge Committee, conceived the idea of promoting the building of a toll bridge from Lansing over the Mississippi river to a point. on the Wisconsin shore. To that end through their efforts on March 10, 1928, Congress passed an act (45 Stat. 280) authorizing the construction of such bridge, and on March 20, 1928, the Lansing Bridge Committee effected the incorporation of the Lansing Bridge Company under the laws of Delaware. During the succeeding year, the articles of incorporation were amended, changing the name to the Iowa-Wisconsin Bridge Company and altering the original plan of capitalization so that the authorized capital stood at 3,750 shares of Class A stock, which was a preferred nonvoting stock of a par value of $100 per· share, bearing a ·stipulated cumulative dividend and redeemable according to certain conditions of the articles; and also 3,750 shares of common·stock of no par.value. Little was accomplished for a year and a half after the incorporation of the Bridge Company, and during the summer of 1929 the Lansing Bridge Committee and certain directors of the Bridge Company contacted and had certain negotiations with John W. Shaffer of Minneapolis, Minn. Shaffer had organized a corporation under the laws of Minnesota under the name Standard Shares Holding Company, and he also had a partner and associate, Vernon W. O'Connor, also of Minneapolis. As a result of the negotiations with Shaffer, the company, acting through members of the Lansing Bridge Company, entered into a trust agreement with Shaffer's Standard Shares Holding Company by the terms of which—at least as constructed by the parties—the 'Bridge Company in effect abdicated all of its functions to the Standard Shares Holding Company for the purpose of constructing the bridge, including the issuing and disposition of the shares of stock of the Bridge Company, but limiting the cost of the completion of the bridge to $600,000. This contract was executed on October 26, 1929, and thereafter Shaffer, through his Standard Shares Holding Company, which he owned and controlled, proceeded with the promotion and construction of the bridge. The career of the project under Standard Shares Holding Company , extended over approximately a year's time and was exceedingly checkered in hue. During that year the Standard Shares Holding Company, through stock of the Bridge Company issued to it, completely controlled that corporate organization. On November 9, 1929, the Bridge Company under Shaffer employed Shaffer to engineer the bridge contract for 10 per cent. of the total construction cost. This contract was assigned to John W. Shaffer & Co., another of Shaffer's corporations. On December 7, 1929, Standard Shares Holding Company, acting by Shaffer, contracted with Shaffer's partner, Vernon W. O'Connor, to do the grading for the bridge approaches at the rate of 24 cents per cubic yard. This work was immediately sublet by O'Connor to Kramer & Hogg at 15 cents per cubic yard, and later O'Connor reassigned the original contract to Shaffer & Co. In December, 1929, Standard Shares Holding Company for the Bridge Company, still acting by Shaffer, contracted with O'Connor to build the substructure of the bridge for $193,196.81, estimates to be approved and work to be accepted by Shaffer. This contract was immediately .sublet by O'Connor to Industrial Contracting Company for a maximum of $120,748, but was actually completed for approximately $98,000, and on April 4, 1930, this original contract was reassigned to John W. Shaffer & Co. Under these contracts the grading and substructure of the bridge were practically completed during the first year. A large amount of stock in the Bridge Company was sold all at $100 per share, common and preferred selling at the same price.

The grading and substructure of the bridge were nearing completion on October 1, 1930, and the limitation under the trust agreement for the completion of the bridge was also about to expire. Shaffer and his Standard Shares Holding Company had experienced a slowing up of the sale of shares of the Bridge Company, and began to cast about for aid, both in a financial way and in the movement of stock sales.

As has been stated, up to this time John W. Shaffer had complete control of the Bridge Company and his partner, O'Connor, at his instance, had been made president. The previous construction contracts had been held by Shaffer himself, or his solely owned John W. Shaffer & Co., and assignments had been made to V. W. O'Connor his partner, and thereafter subcontracts had been made with the real concerns who did the grading and completed the substructure. Between the price paid the subcontractors for actual construction and the original contract price which Shaffer caused to be agreed to be paid to himself, there was a wide difference. Interveners' claim that a pretty thorough job of looting had been done up to this point seems not to be without foundation. The point had been reached when construction of the superstructure was about to begin, contracts had been negotiated for the steel with McClintic-Marshall Company of Pittsburgh, and for the putting up of the steel, that is the construction of the superstructure, contract had been negotiated with Industrial Contracting Company of Minneapolis. These companies demanded responsible assurance that payments to them would be promptly met. Shaffer through his personally owned corporation, John W. Shaffer & Co., was to have the primary contract for the construction of the superstructure, and the contracts with McClintic-Marshall Company and with Industrial Contracting Company were to be subcontracts. In these circumstances, some time in October, 1930, John W. Shaffer contacted John A. Thompson, who had an office with Shaffer and his concerns in the Phœnix building in Minneapolis, Minn.

John A. Thompson, as the record indicates, was a promoter and financier. He was president, principal owner, and in control of Phœnix Finance System, Inc., apparently both an active and a holding company. Thompson had caused to be created some six or seven other Phœnix companies, only one of which besides Phœnix Finance System, Inc., shows in these transactions. Thompson also was the sole owner of a corporation known as Thompson & Co., which it is claimed was a stock selling and brokerage concern. Thompson & Co. shows prominently in the negotiations touching this case. The negotiations between Shaffer and Thompson resulted in an agreement that Thompson should have complete control of the Bridge Company, that Phœnix Finance System, Inc., would guarantee the subcontractors, McClintic-Marshall Company and Industrial Contracting Company, their payments. That the principal contract for the building of the superstructure should be let to John W. Shaffer & Co. That a substantial block of stock in the bridge should go to finance Phœnix Finance System, Inc., for its services. As a result of these agreements on November 1, 1930, the board of directors of the Bridge Company were convened and the by-laws of the corporation were amended increasing the number of directors, and thereupon immediately afterward J. A. Thompson, A. B. Wilder, H. T. Wagner, and Edward O'Connor were elected directors. Vernon W. O'Connor then resigned as president and J. A. Thompson was elected in his stead. Suffice to say from that time on until shortly before this suit was commenced J. A. Thompson and other officers of Phœnix Finance System, Inc., and other employees of that company controlled completely the Iowa-Wisconsin Bridge Company, notwithstanding there were more than 250 other stockholders holding from 1 to 35 shares of stock each, and all of which had paid $100 per share for their stock, whether preferred or common.

In pursuance of the agreement between John W. Shaffer and J. A. Thompson, two important contracts were drawn up and executed. One was a contract between Iowa-Wisconsin Bridge Company and John W. Shaffer & Co. for construction of the substructure of the bridge. It was executed on behalf of the Bridge Company by J. A. Thompson, president, and on behalf of the John W. Shaffer & Co. by John W. Shaffer, president. It bore date November 12, 1930. The other contract, although a part of the same agreement, bears date November 10, 1930, two days previous to the substructure contract, and was between Phœnix Finance System, Inc., first party, John W. Shaffer & Co., second party, and Iowa-Wisconsin Bridge Company, third party. Phœnix Finance System, Inc., executed by J. A. Thompson, president. John

136

W. Shaffer & Co. executed by John W. Shaffer, president. Iowa-Wisconsin Bridge Company executed by E. W. O'Connor, chairman of the board. O'Connor testified that he executed on behalf of the Bridge Company because it would not look well for J. A. Thompson to sign both as president of the Phœnix Finance System, Inc., and as president of the Bridge Company.

The first contract above mentioned provides in substance that the contractor was to erect the bridge in accordance with the plans and specifications, and that the owner in consideration thereof agrees to pay the contractor an amount equal to $10,000 cash, and 3,200 shares of the capital stock of the Iowa-Wisconsin Bridge Company in hand paid, receipt of which is acknowledged by the contractor. Contractor agrees to furnish a surety bond for the performance of the contract, the expense of the same to be paid by the owner.

The second contract above mentioned provides that "in consideration of one hundred forty (140) shares stock of the Iowa-Wisconsin Bridge Company in hand, paid by Third party, receipt of which is hereby acknowledged by First party and in consideration of the premises and provisions of this agreement, the First party does hereby agree to and by other endorsements does guarantee the cash payments required to be paid by the Second party to McClintic Marshall Co. of Pittsburg and Industrial Contracting Company of Minneapolis according to contracts with said companies providing for work and material to build the Black Hawk Bridge at Lansing, Iowa." It may be here stated that on numerous occasions and in numerous documents the bridge is referred to as Black Hawk bridge, Iowa-Wisconsin bridge, and Lansing bridge, interchangeably. The contract further provides: "In consideration of the premises and the values accruing to Second party from said guarantees by First party, the Second party hereby agrees to meet and pay promptly when due all payments guaranteed by First party and Second party further agrees that it will pay on demand to First party any sums First Party may be required to advance by reason of any of the endorsements or guarantees in connection with the building of the said Black Hawk Bridge." And the contract further provides: "In consideration of the premises and the benefits to Third party, by reason of any endorsements or

guarantees of First party, the Third party hereby agrees that in event Second party fails to pay and discharge all of the payments aforesaid and/or first party is required to advance any sums of money by reason of any endorsement or guarantee in connection with the financing of the said Black Hawk Bridge then and in that event the Third party agrees to pay First party on demand a sum equal to the total amount due to First party from all causes in connection with said financing of said bridge.

"It is agreed by all parties hereto that in addition to the principal sum, interest at the rate of 8% per annum will accrue and be payable upon and with all sums remaining unpaid to First party after March 1st, 1931, and that all sums advanced by First party hereunder shall become payable to First party on demand."

Said contract further provides: "Second party agrees to provide a Standard Completion Bond guaranteeing completion of the Bridge, Premium to be paid by First party."

Said contract further provides: "Third party agrees that First party may take over possession of and control of the Black Hawk Bridge and all work and management of all things in connection therewith at any time during any default of or any failure of Third party to promptly meet any payments herein required of it to be made and that First party may have and hold said Bridge and all things belonging thereto until said sums are paid in full as required hereunder."

The above contract is peculiar when it is primarily supposed to be made for the benefit of the owner and to enable the principal contractor to perform his agreement. The furnishing of a surety bond was waived and never furnished, and by the terms of this contract the owner is first made to deliver to the guarantor 140 shares of stock at an agreed valuation of $14,000 (the valuation is shown elsewhere in the record) as compensation to the guarantor to guarantee the contractor, and then to follow with the provision that the owner shall guarantee the guarantor.

After the two foregoing contracts were concluded, a third contract called a "Stated Settlement Agreement" was executed on November 26, 1930, between Standard Shares Holding Company, by John W. Shaffer, and Iowa-Wisconsin Bridge Company, by J. A. Thompson. Under the provi-

sions of this agreement, it is recited that the trustee (Standard Shares Holding Company) had sold for the account of the Bridge Company 1,892½ shares Class A stock, and 1,617 shares Class B stock, for the total sum of $350,950. The trustee relinquishes all right, title, and interest which it may have except 1,500 shares Class B stock, and agrees that it owes the Bridge Company $17,659.69, which was to be paid before November 25, 1930. All other assets of the Bridge Company were to be surrendered by the Standard Shares Holding Company. There was turned over assets at that time from which the Bridge Company realized in cash approximately $80,000.

Shortly after the execution of such contract, John W. Shaffer & Co. sold the 3,200 shares of stock which it received under the construction contract to Thompson & Co. for $224,000, for which Thompson & Co. gave its note. Under these arrangements, and while the Bridge Company was under the control of J. A. Thompson and Phœnix Finance System, Inc., construction progressed under the subcontracts. As Shaffer needed money from time to time to pay subcontractors, Thompson & Co. made payments on its note and it in the meantime was selling stock at $100 per share. There is no claim that Thompson & Co. did not eventually pay the entire face of the note. In the meantime the Bridge Company was collecting very considerable sums of money on the assets turned over by the Standard Shares Holding Company, and, as stated, eventually collected about $80,000.

On the 10th day of March, 1931, a meeting of the board of directors of the Bridge Company was held. Officers were elected, Vernon W. O'Connor, chairman of the board, John A. Thompson, president, A. B. Wilder, vice president, Thomas H. Bakewell, vice president, Oscar R. Thorson, secretary-treasurer. The record then recites: "The President stated that sufficient funds had not been received from the sale of stock to properly finance the completion of the Black Hawk Bridge," and the following resolution was adopted:

"Whereas, the funds received from the sales of stock of this corporation have been inadequate to properly finance the rapid completion of the Black Hawk Bridge, and

"Whereas, it is deemed by this Board expedient and advisable and to the best interests of this corporation not to delay the construction of this bridge through the shortage of finances, and

"Whereas, it is possible to borrow Fifty Thousand Dollars ($50,000.00) for these purposes,

"Therefore, be it resolved, that the Vice-President, A. B. Wilder, and the Secretary, Oscar R. Thorson, be and they are hereby authorized and instructed to negotiate a loan of Fifty Thousand Dollars ($50,000.00) from the Phoenix Finance System, Inc. payable six months from date, with interest from date at eight per-cent (8%) per annum and to execute for and on behalf of this corporation proper papers pledging all of the real and personal property of the Iowa-Wisconsin Bridge Company for the payment and satisfaction of said loan, and to sign such note, agreement or pledge, and to all things as is in their judgment necessary to accomplish this loan and to see that the loan is properly taken care of at maturity, and this Board of Directors hereby goes on record as pledging all of the assets of the Iowa-Wisconsin Bridge Company to the Phoenix Finance System, Inc. for the full and complete payment and satisfaction of all of the obligations and debts of the Iowa-Wisconsin Bridge Company to said Phoenix Finance System, Inc. as they may fall due."

The Bridge Company having paid in full for the construction of the bridge, it is not shown why any insufficiency of funds concerned it. In any event, the mortgage was duly executed and delivered and entries made in the books as though $50,000 had been received by the Bridge Company and disbursed, but in fact no such payment had been made. In this connection certain checks were drawn, one by Phœnix Finance System, Inc., for $35,000 payable to Iowa-Wisconsin Bridge Company, "Pay to the order of John W. Shaffer & Company." Shaffer & Co. immediately indorsed the check over to Thompson & Co. and Thompson & Co. indorsed it back to Phœnix Finance System, Inc., the original drawer of the check. The memory of those handling this check was exceedingly dim on the taking of testimony, and it was not explained why the check was drawn or what purpose it subserved. No such sum was needed by the Bridge Company, and there is no showing that it paid any debts as such check passed through the circuit. Another check of $15,000 was drawn by Phœnix Finance System, Inc., by

J. A. Thompson, president, payable to Iowa-Wisconsin Bridge Company. It likewise made a circuit under appropriate indorsements to its original drawer, Phœnix Finance System, Inc. No obligations were paid by either of these checks, but they were supposed to have offset the $50,000 mortgage. This mortgage was authorized March 10, 1931, and formally executed on the same day.

John A. Thompson, Phœnix Finance System, Inc., and Thompson & Co. had been during the preceding winter urging the sales of stock in the Bridge Company held by Thompson & Co., and were in negotiation with Elliott-Rodgerson Company of Minneapolis, endeavoring to enlist that concern to undertake the sale of the Bridge Company's stock. On February 5, 1931, Phœnix Finance System, Inc., by J. A. Thompson, president, wrote a letter to Elliott-Rodgerson Company, Minneapolis, Minn., in which he very elaborately assures that concern with statements of fact and many figures, demonstrating a financial situation entirely adequate to complete the bridge. Rodgerson was a witness and testified that Thompson assured him that $750,000 would be the entire capitalization, and that no mortgage would be placed upon the bridge. A large number of stockholders gave testimony to the effect that they bought upon the representation that the bridge would be entirely unencumbered. Elliott-Rodgerson Company, under Thompson's representations, sold considerable stock, all stock being sold at $100 per share. Construction progressed and the bridge was completed and opened on June 17, 1931.

After the opening of the bridge, a number of directors' meetings were held devoted to the management of the property. On October 23, 1931, a directors' meeting was held at which the purpose of the meeting was presented to the effect that there was still to be paid for the completion of the bridge approximately $40,000, and that the corporation was threatened with suit by certain creditors (unnamed) ; that since the company had no funds, it will be necessary to borrow some in some manner. After discussion, the meeting was adjourned without action to Monday, October 26, 1931. On October 26, 1931, the meeting reconvened, the purpose of the meeting was again announced, and it was suggested by Mr. Wagner, a director, that a bond issue could probably be obtained for 6 per cent. There was general discussion

but no action, and the meeting adjourned to meet at Des Moines, November 2, 1931. On November 2d the meeting convened without a quorum and adjourned, convened on November 5th without a quorum and adjourned, and reconvened on November 10th, a quorum being present, J. A. Thompson, president, presiding. At this meeting a resolution was presented reciting the existence of the $50,000 mortgage and default in its payment when due; that there was $12,000 due McClintic-Marshall Corporation; $13,000 due Kremer & Hogg; and that the Phœnix Finance System, Inc., had recently advanced to Industrial Contracting Company $10,000 and other additional obligations aggregating approximately $40,000, and, after numerous recitals of financial embarrassment, winding up with a proposal to effect a bond issue of $200,000 and the execution of a mortgage deed of trust to secure the same for the alleged purpose of refinancing the needs of the Bridge Company. A resolution was unanimously adopted with authority for the president and secretary to employ legal counsel and cause to be prepared the mortgage deed of trust and the bond issue. Then followed a series of additional resolutions authorizing the issue of bonds to take up the claims of Kremer & Hogg, McClintic-Marshall Corporation, and the $50,000 mortgage to Phœnix Finance System, Inc.

On December 22, 1931, a special meeting of the stockholders was called at which the Thompson forces controlled 2,273 shares, mostly by proxy, and the bond issue carried at the directors' meeting was in form approved, there being 335 scattered votes against the resolution.

Having completed the formalities of the issuance of $200,000 in bonds, the next step appears to have been to distribute them. At a meeting of the board of directors held March 7, 1932, at which were present the following directors, J. A. Thompson, president, M. K. Thompson, wife of J. A. Thompson, Emory H. English, officer of Phœnix Finance System, Inc., and later a director and officer of Phœnix Finance Corporation, A. B. Wilder, vice president of Phœnix Finance System, Inc., and later of Phœnix Finance Corporation, Oscar R. Thorson, an employee of the Thompson concerns, and H. T. Wagner. A resolution was adopted disposing of most of the bonds. $97,000 in bonds were awarded to Phœnix Finance System, Inc., in liquida-

tion of the $97,000 aggregate of items referred to in the master's report and $9,000 only of which the master found to be based upon a consideration to the Bridge Company. The resolution then continues as follows:

"Whereas, it has heretofore been ordered by the Board of Directors that the company re-purchase from Phoenix Finance System, Inc. 517 shares of Class 'A' Preferred Stock of the company for a consideration of $51,700.00 plus interest at the rate of 6% per annum, from January 1, 1931 to January 31, 1932, in the amount of $3360.50, or a total of $55,060.50, and by reason of the fact that the corporation is without funds with which to pay the same, and for the further reason that it is impossible to sell or dispose of said bonds at this time, that there be delivered to the said Phoenix Finance System, Inc., Series 'B' Bonds of the company in sufficient amount to cover the same on a basis of an 8% yield to the said Phoenix Finance System, Inc., and

"Whereas, on that basis Phoenix Finance System, Inc. will be entitled to bonds in the aggregate face amount of $60,609.-86."

The resolution then awards Phoenix Finance System, Inc., $60,500 of the bonds. It will be here noted that 517 shares of Class A stock were purchased by Thompson & Co. and thereafter transferred to Phoenix Finance System, Inc., at 70 cents on the dollar. So in this transaction there was to be a clean profit to the Phoenix concerns of $18,870.50, were we to assume that the Bridge Company had any power to re-purchase these shares.

The resolution then authorizes the delivery of $7,400 of bonds in adjustment of an alleged claim made by Helmer N. Anderson. Later $10,000 in bonds were pledged to the law firm of Bradshaw, Schenk & Fowler to secure $4,000 attorneys' fees. Five $1,000 bonds were awarded to five certain claimants referred to in the master's report and found to be upon adequate consideration and valid. The remaining bonds, the master says, "approximating $19,000.00 or $20,000.00," but which would be exactly $20,100, were issued to the Phoenix Finance Corporation as security for a note of $3,125, given to evidence the payment of that amount by Phoenix Finance Corporation on behalf of the Bridge Company in payment of taxes.

It is proper to say at this point that about the time of the distribution of these bonds or shortly thereafter the Phoenix Finance System, Inc., was liquidated by the simple process of creating a new corporation called the Phoenix Finance Corporation, officered by the same officers as the old one and transferring all of the assets of the old corporation to the new one. The new corporation, created and officered by the same individuals, took over the entire fruits of the activities of the old, so far as concerns this case, and proceeded to carry on with the same notice and purpose, adopting all of the plans and results of its predecessor.

Counsel for plaintiffs—both the trustees and Phoenix Finance Corporation—have in argument, both oral and in writing, stressed greatly a particular matter which they have injected into the situation in connection with their exceptions to the master's report. After the coming in of the report, plaintiffs caused an examination of the books of the Bridge Company, Standard Shares Holding Company, and certain other documents, some of which were not even in evidence, by Ernst & Ernst, a firm of certified public accountants, and attached the report of such accountants to their exceptions. It is claimed for this report that it points out sufficient matters in the record of this case to demonstrate the erroneous character of the master's findings and conclusions. I cannot give to this document—accepting the same as a part of counsel's brief—the effect claimed for it. The issue which was clearly and sharply drawn was whether the books and accounts of the Bridge Company, kept under the supervision of Standard Shares Holding Company and Phoenix Finance Corporation, spoke the truth, or whether they were false and largely fictitious. Touching this issue, the Ernst & Ernst report is nothing short of a petitio principii. The accounts in the report simply attempt to prove the truthfulness of the books and accounts by resorting to the books and accounts themselves. The accountants frankly say that they made no audit and did not attempt to verify the figures by resource to other sources. In these circumstances, I do not see how any weight can be given to the report, even though it were to be considered as a part of the record.

After a careful and laborious examination of the record in this case, I am of opinion that the evidence amply supports

the findings of the master. I am also of the opinion that as applied to the issues and the evidence the master's conclusions of law are sound and supported by the authorities cited, with some comparatively minor exceptions which I will now deal with.

The master found that $10,000 in bonds were pledged to Bradshaw, Schenk & Fowler to secure two notes aggregating $4,000, and that these bonds are valid to the extent necessary to liquidate the $4,000 and interest, as having been based upon a consideration to the Bridge Company. The master's language in subdivisions (h) and (j) of finding 10 is slightly ambiguous and confusing, but taken as a whole the meaning is clear. The defendant and interveners' seventh exception is probably technically well taken. These items, however, will be dealt with in a group of other items which I think will do justice to the pledgees.

■ The master in conclusion of law 5 says: "That under the facts above found, it is apparent as a matter of law that the complainants did not furnish the necessary proof to sustain the validity of the bonds, except the bonds specifically named in paragraph ten of the findings of fact, and the prima facie showing made in the first instance by the complainants has been overcome by evidence of the defendant and interveners except as to those bonds especially named as having consideration in paragraph ten of the findings of fact, and all the said bonds not named in said paragraph ten of the findings of fact as having a consideration, are illegal and void because they were issued fraudulently." This conclusion of law is attacked in the defendant and interveners' eighth exception. I think that in so far as the language of the master's conclusion includes the $9,000 of bonds held valid in the hands of the Phœnix Finance Corporation, and the $3,125 in bonds held valid in the hands of the Phœnix Finance Corporation, it is erroneous. What I have said with respect to the legal status of the Phœnix Finance Corporation as the successor of Phœnix Finance System, Inc., places it completely upon a level with its predecessor so far as equities are concerned. With full notice it has adopted everything its predecessor did, and with full notice that its predecessor had at the outset taken 140 shares of stock of the Bridge Company without paying any subscription price therefor and has not accounted for it. I see no reason why a court

of equity in this particular instance should not observe the well-recognized equitable maxim that "he who hath done iniquity shall not have equity." The allowance of these items would increase the encumbrance to be sustained by the decree to a point where a sale of the bridge could not be avoided. This consideration should not be awarded the plaintiffs at the sacrifice which it would entail.

■ In view of the conclusions of the court, a decree should be entered overruling the exceptions of the plaintiff trustees, numbered 1 to 8, inclusive, and of Phœnix Finance Corporation, numbered 1 to 6, inclusive, and exceptions reserved to the respective plaintiffs. Defendant and interveners' exceptions 1, 2, 5, and 10 having been withdrawn, will not be further noticed. The decree should overrule defendant and interveners' exceptions numbered 3, 4, 6, and 7, with exceptions reserved to the defendant and interveners, and sustain defendant and interveners' exceptions numbered 8, 9, and 11, with exceptions reserved to the plaintiffs.

■ With elimination of the $9,000 item and the $3,125 item allowed the plaintiffs by the master, there remains $15,000 of a charge against the mortgaged property to be protected. This sum is the aggregate of $4,000 due Bradshaw, Schenk & Fowler, $6,000 due Helmer N. Anderson, and $1,000 each due Laura B. Baker, J. W. Dempsey, Lyle Sign Company, M. B. Stone, and Cobb, Hoke, Benson, Krause & Faegre, or their respective assigns. None of these creditors and holders of bonds are shown to be holders of bonds in due course, but the master was of opinion, and the court approves his conclusion, that equity should be done in these circumstances to the extent possible without doing greater injustice to the defendant and interveners. I think a foreclosure of the deed of trust in this case should be denied, because the trust deed and all of the bonds, with the exception of those held by the seven creditors named, are tainted with fraud. And as to those creditors, or their authoritative assigns, equity can be done by a provision of the decree sequestering all earnings and revenues of the Bridge Company over and above such as may be absolutely necessary to pay operating expenses and taxes, and retaining the property in receivership until these obligations, with interest, are fully paid; with the option, of course, to the de-

fendant and interveners to refund this indebtedness in some other manner.

 I am of opinion that the entire costs in this case should be assessed to the plaintiffs, and the decree should so provide.

### Supplemental Opinion and Order.

On the 19th day of December, 1936, after the entry of the original decree in the above cause, the Phœnix Finance Corporation appeared by counsel and filed a motion to vacate the decree and dismiss the bill and cause for want of jurisdiction in that it was a Delaware corporation, as was also the defendant, Iowa-Wisconsin Bridge Company, and the jurisdiction of the court depended entirely upon diverse citizenship. It appears that after the filing of the bill and answer and petition of intervention which by order of court was permitted to stand as an answer in behalf of the defendant, Iowa-Wisconsin Bridge Company, the interveners and defendant moved the court for permission to bring in the Phœnix Finance Corporation, holder and owner of about 90 per cent. of the outstanding bonds, as a party coplaintiff with the trustees under the trust deed described in the original plaintiffs' bill. In the absence of the judge of the district, Judge Molyneaux of the District of Minnesota was holding the December, 1933, term of court at Dubuque, Iowa, and entered an order for the bringing in of the Phœnix Finance Corporation as a coplaintiff with the trustees. Whether the citizenship of the Phœnix Finance Corporation was at the time given any thought does not appear.

 The motion was assigned for hearing in chambers at Sioux City, Iowa, for the January motion day, and was on this 5th day of January, 1937, argued and submitted. The contention now is that the bringing in as an additional party plaintiff of the Phœnix Finance Corporation, organized under the laws of Delaware, ousted the jurisdiction of the court, and that all proceedings thereafter became null and void. I cannot accede to this contention. On the contrary, I am of opinion that a trustee under a corporate mortgage or deed of trust securing an issue of bonds held by numerous beneficiaries with express power to enforce the security on default by foreclosure and sale and to apply the proceeds is the indispensable party plaintiff in the suit to foreclose in a federal court, and bondholders need not be joined unless the trustee is exceptionable for refusal to execute the trust or for adverse interest. I think the following authorities fully establish this proposition: Federal Equity Rules Nos. 37 and 39 (28 U.S.C.A. following section 723); Vose v. Bronson, 6 Wall. (73 U.S.) 452, 456, 18 L.Ed. 846; Richter v. Jerome, 123 U.S. 233, 246, 8 S. Ct. 106, 31 L.Ed. 132; Palmer v. Bankers' Trust Co., 12 F.(2d) 747, 752 (C.C.A.8th Circuit); Guaranty Trust Co. v. Chicago, M. & St. P. Ry. Co., 15 F.(2d) 434, 440, (D.C.,N.D.Illinois, Opinion by Wilkerson); Smith v. Bell, 217 F. 243 (C.C.A.8th Circuit, Opinion by Sanborn); Dodge v. Tulleys, 144 U.S. 451, 12 S.Ct. 728, 36 L.Ed. 501; Bullard v. Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141; Susquehanna & W. V. R. & Coal Company v. Blatchford, 11 Wall. 172, 20 L.Ed. 179; Knapp v. Railroad Company, 20 Wall. 117, 22 L.Ed. 328; Beals v. Illinois, etc., Railroad Co., 133 U.S. 290, 10 S.Ct. 314, 33 L. Ed. 608; Elwell v. Fosdick, 134 U.S. 500, 10 S.Ct. 598, 33 L.Ed. 998.

 I am further of opinion that in a suit to foreclose a corporate mortgage in a federal court by such a trustee with jurisdiction resting solely upon diversity of citizenship, the joining of a party not indispensable whose presence destroys such diversity does not oust the jurisdiction of the court. Under former rules and practice, the doctrine was laid down in Wormley v. Wormley, 8 Wheat. 421, 451, 5 L.Ed. 651, that the joining of a nominal or formal party did not in cases resting on diversity of citizenship oust the jurisdiction of a federal court. In a comparatively recent case and since it has been customary to classify parties in suits in equity in federal courts as indispensable and proper parties, the Supreme Court, speaking through Mr. Justice Butler, said:

"District Courts have jurisdiction if all the parties on the one side are of citizenship diverse to those on the other side. Jurisdiction cannot be defeated by joining formal or unnecessary parties. The right of removal depends upon the case disclosed by the pleadings when the petition therefore is filed (Barney v. Latham, 103 U.S. 205, 215, 26 L.Ed. 514; Ex parte State of Nebraska, 209 U.S. 436, 444, 28 S.Ct. 581, 52 L.Ed. 876), and is not affected by the fact that one of the defendants is a citizen of the same state as the plaintiff, if that defendant is not an indispensable party to

the controversy between plaintiff and defendant who are citizens of different states." Salem Trust Company v. Manufacturers' Finance Company et al., 264 U. S. 182, 189, 44 S.Ct. 266, 267, 68 L.Ed. 628, 31 A.L.R. 867.

I conceive the same rule to be applied in the following cases: Blytheville, L. & A. S. R. Co. v. St. Louis-San Francisco Ry. Co., 33 F.(2d) 481 (C.C.A.8th Circuit); Equitable Trust Co. v. Denney, 24 F.(2d) 169 (C.C.A.7th Circuit); Stewart v. Dunham, 115 U.S. 61, 5 S.Ct. 1163; 29 L.Ed. 329; Walden v. Skinner, 101 U.S. 577, 25 L.Ed. 963; Kerrison, Assignee, v. Stewart, 93 U.S. 155, 160, 23 L.Ed. 843; McArthur v. Scott, 113 U.S. 340, 396, 5 S.Ct. 652, 28 L.Ed. 1015; Rand v. Walker, 117 U.S. 340, 344, 6 S.Ct. 769, 29 L.Ed. 907; McNutt use of Leggett v. Bland, 2 How. 9, 11 L.Ed. 159; Bonnafee v. Williams, 3 How. 574, 11 L.Ed. 732; Wood et al. v. Davis, 18. How. 467, 15 L.Ed. 460; Bacon v. Rives, 106 U.S. 99, 1 S.Ct. 3, 27 L.Ed. 69; Maryland use of Markley v. Baldwin, 112 U.S. 490, 5 S.Ct. 278, 28 L.Ed. 822; Wilson v. Oswego Township, 151 U.S. 56, 14 S.Ct. 259, 38 L.Ed. 70; Massachusetts & S. Construction Co. v. Cane Creek Twp., 155 U.S. 283, 15 S.Ct. 91, 39 L.Ed. 152.

In the instant case, no exception has ever been raised to the action or want of action of the trustees. On the contrary, the record in this case discloses that at the request of the Phœnix Finance Corporation the trustees, Bechtel Trust Company and A. H. Schubert, promptly filed the original bill and that the trustees under the mortgage thereafter appeared by counsel selected by the Phœnix Finance Corporation and prosecuted the foreclosure suit at all times and stages diligently. The trust deed in the instant case expressly vests the trustees with ample powers both to foreclose in case of default to effect a sale, and to apply the proceeds. In such case, I am of opinion that the trustees were the only indispensable parties plaintiff, had exclusive control of the litigation, and that the only effect of bringing in the Phœnix Finance Corporation was by admissions in testimony to establish the status of that corporation as the holder and owner of about 90 per cent. of the bond issue. That so far as jurisdictional considerations are concerned, that corporation was merely a formal and not an indispensable party.

In view of what has been said, I find the motion without merit, and it is ordered that the same be denied and stricken from the record. To which order counsel for the Phœnix Finance Corporation excepts.

## On Petitions for Rehearing and for Modification of Decree.

After several years' struggle by the parties, the above cause came on for final decree on the 1st of December, 1936, and on that date the court filed its opinion, its findings of fact and conclusions of law, and entered its final decree. On December 19, 1936, Phœnix Finance Corporation filed a motion to vacate the decree and dismiss the cause upon the ground that the court had lost jurisdiction of the cause when it permitted the Phœnix Finance Corporation to be made a party coplaintiff with the trustees under the mortgage. The theory was that jurisdiction had rested on diversity of citizenship, and the making of Phœnix Finance Corporation, a Delaware corporation, coplaintiff, destroyed diversity of citizenship inasmuch as the Iowa-Wisconsin Bridge Company was also a Delaware corporation. For reasons stated in the supplemental opinion filed January 5, 1937, the motion to vacate the decree and dismiss the cause was overruled. On January 29, 1937, Phœnix Finance Corporation filed its petition for rehearing and modification of decree, and on the same date the trustees filed their motion to vacate and dismiss, similar to that previously filed by Phœnix Finance Corporation, and also in the alternative adopted the petition for rehearing of Phœnix Finance Corporation. The interveners in behalf of the Bridge Company filed motions to strike and resistances to the petitions for rehearing. On the 18th day of February, 1937, these motions and petitions were fully argued orally before the court and briefs submitted, and all matters then before the court submitted.

The court has determined to entertain the petitions for rehearing and modification of decree, rather than to strike the same, and dispose of the same on their merits. Respecting the motions to vacate and dismiss for want of jurisdiction, that matter has been fully answered by the supplemental opinion of the court filed on the submission of a like motion by Phœnix Finance Corporation, on January 5, 1937. The petition for rehearing filed by Phœnix Finance Corporation, and adopted by the plaintiff trustees, rests upon the claim that

the master, to whom the cause was referred in its entirety, received the submission under a misapprehension, and that the plaintiffs had also been of impression that they were to take further testimony at some future time when they submitted their bonds to the master or to the court. They further contend that the cause in behalf of the trustees and the Phœnix Finance Corporation was mismanaged by their counsel, and that now having taken in new blood at the bar, the present counsel should be given a chance to try the case over.

Having in mind the analogy of petitions for rehearing in equity causes and motions for new trial in law causes, the court is unable to find any substantial merit in any of the claims for a rehearing. The defense interposed to the plaintiffs' cause of action was that the bond issue and mortgage securing the same were all a part of a deliberate fraudulent scheme to obtain possession and ownership of the bridge after its completion and freeze out all of the stockholders. This scheme, as alleged and as proven, dated back to the inception of a certain $50,000 mortgage, and proceeded forward including the plans and their execution for the issuing of the bonds and the mortgaging of the bridge. During all of this time the Phœnix Finance System, Incorporated, and its successor, Phœnix Finance Corporation, and the Bridge Company had interlocking directorates. The so-called Thompson interests predominated in all of them. As the master pointed out in his fourth conclusion of law, in the circumstances with the charge of fraud and conspiracy made, the burden was on the plaintiffs who had brought the suit at the instance of the Phœnix corporations, to show clean hands and fair dealing. This the plaintiffs not only failed to do, but throughout combated the interveners who were permitted to defend in behalf of the Bridge Company. The interveners obtained an order of court for the production of the books and records of the Phœnix Finance Corporation before the master, but Phœnix Finance Corporation vigorously and successfully, it appears, prevented the production of those books and records, and its officer when on the stand before the master, declared his inability to produce, for they had been sent to the State of Florida. It is now with poor grace that the plaintiffs invoke the discretion of the court for a rehearing in order to use those very books and records. Anticipating an adverse ruling, the petitioners alternatively pray for a modification of the decree with provisions commanding the reissuing of certain shares of stock to Phœnix Finance Corporation, which it canceled when fraudulently obtaining the bonds. One might conceive some invidious analogies to this situation. Having attempted the strong box of another, and being hoisted by what is now claimed to be a premature explosion, they volubly invoke the compassion of the court to restore valuable implements of their craft left behind. I see no reason why a court of equity should be deeply concerned in giving any affirmative relief to the Phœnix Finance Corporation. On the other hand, I think the petitions for rehearing should be denied and the motion to dismiss and vacate the decree overruled, and it will be so ordered.